The court will call its argument for this morning, San Diego County Employees Retirement Association versus Johnson and Johnson appellate number 24-1409. Good morning, Your Honors. May it please the court, Rob Hochman for Johnson and Johnson. This case is fundamentally about how both the law governing securities fraud class action maintains the distinction between price reaction and price impact and why it must do so. And just to level set on terms. As this court is well aware, stock prices move for lots of reasons. Routine movements in price, those are called price reaction. Those respond to new information about a public company's financial health and prospects. But sometimes prices move because the public has learned something new about the company that shows what the company had previously said about itself was false. But in this instance, as I understand your briefs, you suggest that the disclosures that the plaintiffs rely upon do not contain new information.  And that suggests, because it's not new, that presumes that the information that they claim is in these disclosures was already in the market. Was priced through the market, yes. And my question, if you have two questions. One, where in the record is there evidence of when that information that they claim was new was first disclosed? The first question. The second is, do you have any evidence that the market reacted to that information when it was first disclosed? Because if it was not new now, it was new at some point. Well, the fact that it, well, let's start with the second half of that question because I want to begin there because I think that's an important point. The market doesn't necessarily have to react to every bit of new information. And the fact that the market doesn't react to new information may mean that the information is not corrective of any false statement. It may mean that any false statement at issue in the case is not material. There are all sorts of reasons why the price might not move. Let's focus. Forget the reaction. Tell me where in the record. Yeah, so the place in the record, so if you turn to 10, so we have, we created several charts. And I'm going to focus here on the Reuters article because that's where most of the argument is. And I'm aware of the arguments that the Reuters article, from your point of view, can be sourced back to information in the marketplace. I want to go back in time. If the information in the disclosures from J&J's point of view is not new now, meaning as early as that September 2017, that first disclosure that your adversaries point to, at some point it was in the market.  Okay. Yeah. And I know you point to two disclosures that predate the September market or September disclosure. Is that when it was first disclosed or was it in the market at some date before that September 21? Well, there's a lot of, because there's a lot of facts at issue in the Reuters article, what we did is we went through sort of chart, you know, assertion by assertion and identified where in the record, whether it was previously disclosed on websites, whether it was discussed in newspapers, whether it was discussed in trial, in previous open court trials. And that's a 1086. The panel's completely aware of those sources. We completely understand it. My question for you is, when was the first time the information the plaintiffs say undermines the representations about the safety of the product? When was it new? Because at some point it was new from your, from the theme of the general judge. Well, at least, you know, at least I would say you could go, you could go back certainly to the Herford trial, which predates most of the disclosures except for the Bernstein law firm. You have the Bloomberg story itself, which was the basis of the Bernstein disclosure itself, and that's six days before. So I don't think you're anywhere. There's no disclosure that occurred in this case that wasn't preceded by something else. It's sort of a cascade of things coming down. There was a first one, though. So I would say the Bloomberg, it couldn't have been any later than the Bloomberg article upon which the Bernstein law firm relies. In fact, it doesn't even rely, right? It just points to. And that's sort of what's interesting about this case, right? Because the Bernstein, I think the Bernstein disclosure. I think I want to focus you on, I'm looking at, you say something's not new now. It was new at some point. You're telling me it was sometime before September 2017-ish. Yeah. Is there anything in the market that shows when that information first was put in the marketplace that there was a reaction to the disclosure? And that's why I began with the second part. And here's what happened with that Bloomberg story. This is a perfect example of how this works in this case. In Bloomberg, the Bloomberg story was first identified, actually, as a corrective disclosure in this case. Plaintiffs pled that originally. They abandoned it. Why? Because there wasn't a price reaction to that. Because the market had long since been aware through litigation that had preceded even that story, through discussions and reports and all sorts of other information, market analysts whose job it is to follow things like talc litigation and its potential impact on J&J and all of those stories. So there wasn't a price drop at all that was material. Can you make the representation at the time the plaintiff's class made their purchases, that the market already, at the time of the purchase, at the very beginning of the class period, had already absorbed the purported misrepresentation? What the market had absorbed was exactly what the price drops that they reflect are about, which is the risk of potential talc litigation exposure that J&J faced, certainly from September 2017 forward. And you're saying that's not a qualifying, foreseeable risk of information. No. That would affect the market. Is that your position? So if you look at 493 to 95, what you will find is that the plaintiffs in this case tried to plead this case, tried to say the false statement at issue in this case was that we concealed the amount of risk connected with talc litigation. And the district court said, no, we didn't conceal any of that. You can't plead that under the PSLRA. So that's out of the case. And so given that that's out of the case, they can't come back in at class serve and try to reintroduce the stock price drops as litigation rolls forward and risk becomes materialized into sometimes big judgments. So the statement was really only pushed with the jury verdict, not the others. Their position, as I understand the plaintiffs, is their various disclosures were reflecting the fact that there were misrepresentations concerning the safety of the product. I'm using that to categorize. That is the current complaint right now. Right. And so. But the world was well aware of all of the facts that have been discussed in all of the corrective disclosures that are at issue with respect to that alleged false statement. But what the world wasn't aware of and what the price continues to react to is the growing number of talc plaintiffs, the efforts of people like Mark Lanier, and we have his affidavit in the record. It talks about the need to get publicity out there to generate a large volume of cases in order to make the cost of defending the litigation significant. And, of course, every once in a while you might get a huge verdict like the Ingham verdict, even though we win and win and win, trial after trial and appeal after appeal, we demonstrate that, in fact, we're not liable for this. Every now and then something might happen. All of that is pressures and risks known fully to the market. You're not making an argument that there is truth in the market, correct? Correct. Because there's been constant denials of the representations, correct? Correct. We're not making a truth in the argument, nor are we making a loss causation argument, right? And the law permits us to do that anyway, right? That's Goldman, and it's straightforward, right? This is the rigorous analysis that must be required at class certification. So I do want to ask you about the newness, and I just want to understand what has to be new. So does it have to be the correction itself as correcting the original misrepresentation, or does a new basis for the same correction count? So, for instance, if the misrepresentation is, I say, there's never been toxic waste dumped on my property. And so that's the misrepresentation. And something comes out that shows when I bought it, I received a report that, in fact, there used to be. I assume you would say that's a correction.  Can I add, on the same line of questioning, what's your best authority that the information has to be new? Yeah. Were you finished, Judge Chung? Then there's a second disclosure that says, also, two years later, Judge Chung tested soil at the property, and there was positive results for toxic substances. Yeah. It's the same correction, so to speak, in that it shows that I knew there was toxic material on my property. But it's a different basis. So is that two corrections, or is that one correction? Yes. You can have multiple corrections sort of flowing out. You can have partial corrections.  We recognize there's plenty of case law about that. But, I mean, is the new part what is actually corrected, which is simply, I know there's toxic, or does each basis count as new? The facts. What has to be new, and this has been, by the way, new and corrective. Like, it's not enough just to say some new thing that isn't corrective. That is a mismatch with a false statement. It must be new and corrective. In your examples, Judge Chung, both facts, the report and additional investigation, those are new facts. And the important thing is facts are different from opinion. And the cases on that are Legion, Meyer, Omnicom, even Ameticist, one of their favorite cases. Facts are what matters. So there has to be some new fact that comes out that is corrective. That's what the market incorporates through the efficient market hypothesis. Now, as for Judge Restrepo. Judge Restrepo, what's the law and where is the authority that has to be new? So my, well, two things. First of all, there's the entire logic of the entire market hypothesis sort of treats that. Both experts in this case agree with that. But I'd point first to Omnicom because I think that might be as good an example as you can get. I think also the Einhorn analysis in Meyer is also a similar kind of case, which demonstrates that these are, this is the way the efficient market hypothesis works. In Omnicom, you had a transaction, the Seneca transaction. And there had been fully disclosed errors, accounting errors in that transaction, right? Well, sometime later, accountants come out with a report about the company. And the stock drops after the accountant report. And what the Second Circuit says in Omnicom is that's price reaction. It can't be price impact from the alleged false statement. It doesn't, the alleged false statement being repeated again, the facts underlying the Seneca transaction, have already been priced into the market because of the efficient market hypothesis. And the importance of the efficient market hypothesis cannot be understated here. It is the logic that runs through a variety of different elements in the- It's also not disputed in this case. And it's not disputed in this case, right? And so you have to take the good with the bad, right? So they have all sorts of facts where they rely on small sources like the Bernstein law firm or like another law firm's report or other people. The facts about TALC website, they say can move the market because it has false statements. But then when it comes time for them to pay the price of how the efficient market hypothesis absorbs things, they say, oh, no, no, it doesn't have to be really new. You know, maybe people were evaluating it differently. But opinions and reporters' opinions like the Reuters opinion, that doesn't count. And that's straight under the cases I've already cited. Goldman says, you mentioned Goldman, and Goldman says we're supposed to consider all evidence. And the evidence we're supposed to consider for the purposes of the rebuttal is the defendant has the burden of persuasion to put forth evidence to demonstrate there's a severance of the link between the misrepresentation and the price plaintiffs paid. What is your affirmative evidence in this case? Do you have something more than saying their corrective disclosure should not count? No, that is, but that's enough. That's, in fact, exactly how it is. What is your authority to say discounting the plaintiff's evidence is equal to carrying your burden of proof? Because our burden, because the corrective, the way the presumption, and I see I'm into my rebuttal time. And I'm going to have my colleagues. You didn't reserve your time, but as I understand, you wanted just one second, counsel.  You want three minutes? Yeah. We'll give you three minutes, but we're going to use this period to let us ask you our questions and then we'll have you sit down. Of course. So the way the efficient market hypothesis works is they get the presumption of reliance, which is class-wide, everyone, because the market takes in the information and the competitive nature, and this is discussed pretty thoroughly in 3689 to 90 in our expert. It's also discussed in basic, right? The market takes in the information and their trading opportunities, and it's that competition for trading opportunities that means that it doesn't really matter how many people know this fact. It just means that it gets reflected into the price, and that's why it's uniform across the board, right? So why does it have to be new and corrective? Because in a case like this, what we call an inflation price maintenance case, the way reliance works is kind of mechanical, and both Goldman and Halliburton, too, talk about this. It's kind of three steps, right? One, the prior false statement props up the price. Two, then new public information reveals that the prior false statement, the prior statement was false. And then three, the stock price quickly declines, and you need all three of those steps. Otherwise, you can't infer back. That's what the inflation price maintenance does. It infers back to the original false statement that the drop reflects the propping up of the market. That's reliance, right? And your position is the only way the plaintiffs can carry their burden of proof is based on that sequence. There's no other way that they can prove it?  That's it. Well, the way they've played this case, yes. In fact, that's – and remember, they choose the corrective disclosures. They're the ones who get to decide. They're the ones who decided to make this an inflation price maintenance case. These are their choices. And when you make these choices, you lock yourself into being sure that your corrective disclosures are new and corrective and have the kind of match to the prior false statement and work through the efficient market hypothesis the way the law requires. And if you don't – What if the new – what if these disclosures are not intelligible or opaque to the average participant in the market? Is that a requirement? So, first of all, no. I don't think the average participant in the market plays any role. This is not like other cases where there might be – where you have a kind of reasonable investor standard for, say, statute of limitations purposes. The market doesn't work that way. But there is room for judgment here in some cases, right? And I think Merck talks about this, actually. When Merck talks about the math that was done, the case in Merck sort of holds back, I think rightly so. It says, we don't know if there's ever a case where, you know, it might be too hard for the market to have been able to incorporate it. And the way the theory works – and again, Clyde explains this. The way the theory works, the marginal cost of acquiring the new information has to be roughly zero for investors. And in a world like this where there's no dispute about this, right, tons of people are watching this stuff. Everybody – there are market analysts all over the place devoted to this stuff. The dollar impacts on investments are enormous. There's no question and nobody doubts. The information out there is being – is available and being picked up.  But to Judd Restropo's point, I think if you read BASIC and the steps of BASIC, the first is that the alleged misrepresentation is publicly known. And if you think of sort of the anti-BASIC test, it would be that the alleged corrective disclosure is publicly known. And I'm just not sure, you know, the asbestos and talc website and the facts about talc website. I don't think it's a mischaracterization when the appellees say their document dumps. I mean, I went to the Wayback Machine site that you listed, the archive, and it's – there's not even any interface. It's just a set of links that you have to know which one to click. Then you – first you have to click like the declassified or whatever. Then you have to click J and J. And then all of the – there's thousands of documents with obscure names like JN8432-. You know, I don't see that that is – that might be publicly available. But there – that's not what BASIC says. BASIC says publicly known. And if this is just the inverse, that is the market reacting to information, it should be publicly known. The same can be said about the facts about talc website. Two responses on that. First of all, if you go to 1087 and 1088 where we have one of the charts, you'll see that there's no fact at issue in connection with the Reuters article or at issue in any aspect of this case that depends exclusively on disclosure on that website. So that's kind of neither here nor there. Second, with respect to websites like that, they themselves allege that statements that we make in those websites and facts about talc can move the market. They can be something they rely on, that purchasers rely on for false statements. You take the good with the bad. If it's going to do one, it has to do the other. And third, and this is what's really important, I understand the phrase publicly available as a kind of – it has a kind of intuitive sense that, like, everyone can find it, it would be easy to find. That's not the point. That's actually not the point. The point is how much effort would the marketplace, the people whose job it is, and this is what Merck tells us, we assume that people whose job it is to follow the marketplace are doing their jobs. And if it doesn't take anything to monitor these websites, to monitor the trials, if that's the job that you have, we assume you do your job. Right? And so it doesn't matter that, you know, maybe not everybody knows this. The people who are seeking trading opportunities and bringing this information into the market are actively doing their jobs, and that's what Merck requires. That's what the efficient market hypothesis requires. And that's what ultimately means that all of the information at issue in this case – How much effort is required to watch, you know, eight hours of a trial every day? It's marginal cost, Your Honor. That's the thing, right? You've got people out there whose job it is to monitor J&J stock, to monitor its liabilities, to monitor the cost it takes J&J to defend these cases, to monitor the number of cases that are out there. So the marginal cost of doing that job is zero, and that's why it all counts. I have one more question, then we're going to call on your adversary to talk. I'm going to ask you the same. Is the only evidence that you are relying upon on behalf of J&J to rebut the basic presumption, the discounting of the corrective disclosures, is that the evidence that you're relying on? So what we are doing – yes. So, first of all, yes. And secondly, what we are doing is we are rebutting the presumption of reliance that depends on the price impact analysis of corrective – of the asserted corrective disclosures of the plaintiff. I want to know what the evidence is. The evidence – What is the evidence that the corrective disclosures are not worthy of guidance?  All of the evidence that we have that no fact in any of their corrective disclosure is both new and both corrective, once you demonstrate that, the link, the rationale of their presumption that the corrective disclosures demonstrate class-wide reliance on the propped-up inflated price evaporates. So your position is it doesn't require you to produce affirmatively evidence, but rather it is sufficient, from your point of view under Goldman, to discount the value of the evidence they rely on. Well, I mean, we did produce evidence. We produced a ton of evidence. All to discount newness. I'm just asking. That's really what your focus is. Yes, that is right. We are allowed to attack that theory in that way. But to be clear, it's our burden. We carry the burden. We have to prove that what they say are corrective disclosures can't count as corrective disclosures that satisfy the presumption of reliance. And so going back to my question, so if a fact is new but the correction is the same, is that – does that count as a new correction? A fact – any time a fact is new and it matches, it's corrective, it can be a new – it can be a corrective disclosure. It might or might not have price impact, but at least it's eligible. And they don't have anything that's eligible. If I could just make sure you guys are talking in the same language. You're using the word correct. You use the word – Judge Chung used the word corrective. You used the word match. What you're talking about is related to, connected with, the alleged misrepresentation at the time of plaintiff's purchase. So it has to be within the same subject area. Which is exactly what Goldman talks about. Okay. And I think what Judge Chung is talking about is a fact that comes out at a later time. From your point of view, as long as that fact is a new fact, but it's within the same subject matter of the misrepresentation. So if it's the same correction, in other words, I knew of toxic material. It's the same correction both times, but since it's a new fact, it counts as a new corrective disclosure for purposes of basic. For purposes of price impact and basic. For purposes of rebutting basic. That's right. And remember, this isn't going to happen very often. I understand, Judge Schwartz, you say we didn't put forth new evidence to rebut the presumption. We put forth a ton of evidence. It's built off their theory of the case that we're not talking about threatening securities law class actions at all. The burden we took here was substantial and we met it. And then Mark Lanier comes in toward the end of the case and says, yeah, of course it was all public. It has to have been all public. And, in fact, I benefit from the reaction to that public information. Counsel, we'll have you back on rebuttal. Thank you. Appreciate it. You're welcome. May it please the Court, Joseph Daly for the lead plaintiff, Appalachee-San Diego County Employees Retirement Association. There's a singular issue facing this Court today, and that's whether the district court, given its broad discretion in considering all available evidence under Goldman Sachs, correctly held that the defendants failed to disprove price impact by a preponderance of the evidence. J&J concentrates on the Reuters report, so will I. I want to jump right into it. The defendant's argument ignores the facts embedded in the Reuters report, establishing that it did convey new information to the market. Now, they focus on 56 specific documents that the Reuters report linked to, but the article itself noted that its reporting actually involved thousands of pages of J&J documents, memos, internal reports, deposition testimony, and while many had been shielded from the public view or not covered in the media, much of their contents is reported here for the first time. Thus, Reuters accomplished what a brief mention in a prior trial or a document, as Judge Chung pointed out, dumped among thousands of PDFs, untitled, unsearchable in a document dump, could not have done. What if we concluded that the Reuters article had new corrective information? Do we have to go back in time for the entire class period to evaluate whether or not the district court clearly erred with respect to its conclusions concerning the prior, the other, the September, the February, July, et cetera, disclosure? Do we have to do that analysis? Well, certainly you need to make sure that the district court brought sufficient rigor to the entire discussion, but I want to bring in here the fact that it's the defendant's burden to disprove price impact and the price impact in this case is most dramatically shown by what happened after the Reuters report. I'm with, I understand your position on that. My question is really focused on our obligation. If we were to agree with you that the Reuters article contained corrective new information and it demonstrated some statistically significant impact, you know, reaction in the market thereafter, that from which we can infer there was a material, you know, misrepresentation that inflated the price. I'll assume all that for the question. Does the court, does the Third Circuit need to then go and look at each one of the other disclosures that your client has put forth as corrective, or could we conclude if Reuters is new, it's new for the whole class period, we're done? Well, in a perfect world, of course, I'd say yes, but no. That's what I want to know is do we have to do that, and if so, why? You would go back to see whether or not the district court abused its discretion in looking at those earlier because the district court went through this entire process. The defendants pointed to all these prior disclosures at the Ingham trial and the Lanzo trial. No, the plaintiffs actually put forth the corrective disclosures for the court to consider, yes? Well, and it's all as part of the record, and the district court, as well as it should have done, said I'm going to consider everything. I'm not just going to look at Reuters. I'm going back to look at these public statements made during these trials, and you know what? Looking at them, I see that maybe it's within, I don't think he used the word penumbra, but I see it's within some sort of overlap. But nonetheless, I find under my discretion that the Reuters report itself had enough new corrective information for the first time coming into the market so that price impact was demonstrated. I totally understand that. All I'm asking is why is it that the court needed to go through the analysis for each one of the disclosures and could not have just rested on Reuters for the entire class period? Is it got to do with the way the plaintiffs presented the case, and therefore the district court needed to evaluate it for some other, like for some later purpose, like the plaintiffs needed, if they were to prevail, for damages? I'm just trying to get a sense of litigation reasons for why these corrective disclosures, other than the Reuters one, needed to be evaluated. That's what I'm trying to find out. And I don't mean to sound flippant. And I don't mean to sound stupid. No, please.  That wasn't implied at all. I didn't think you were implying that. Okay. No, the district court had already taken care of things such as lost causation and materiality previously. I'm aware of that. I'm asking why did they have to do it for this class certification? Because the court was doing its duty under Goldman Sachs to look at all evidence, qualitative as well as quantitative, and looking at those earlier alleged partial disclosures was part of that process. Now, the defendants here, as I said, insist that Reuters had nothing new. And that's not true. We know it's not true. Their own expert conceded two valuable points. Their expert, Dr. Clyden, conceded that when Mount Sinai, when Reuters reported that Mount Sinai researcher, Dr. Arthur Langer, told Johnson & Johnson in 1971 that he had found asbestos, that in 2017, with those personal injury trials that we're talking about underway, J&J lawyers went back to Dr. Langer and spoke with him, and he said, quote, I stand by all of my findings, end quote. Reuters also noted that J&J, unsurprisingly, did not call Dr. Langer to testify in any of those trials. A second point that Dr. Clyden, their expert, concedes is brand new. For decades, J&J had used X-ray scanning as its primary method of asbestos testing. But there was a better concentration method of prepping the powder for electron microscope testing. They were told that it was recommended as optimal by a respected outside university research lab, and they ignored it. Two more quick facts that are brand new in the Reuters report that perhaps Dr. Clyden didn't concede, but nonetheless, I'll explain why they're new. But in doing that, if you could, it goes to the question I asked your colleague, which is, I guess what I'm getting at is the Goldman statement that if the corrective, the alleged corrective disclosure is not a match as far as generality and specificity, it's less likely that the specific disclosure actually corrected the generic misrepresentation. And these misrepresentations seem very generic to me. Asbestos-free and talc is basically not carcinogenic, which one could read into that does not contain asbestos. And all of the new things seem to be extremely specific and all to the same point, which is not only did it have asbestos, which I think was a well-established controversy prior to any of these alleged corrections, that the litigating position of J&J was that there was no asbestos, whereas others said there was. But certainly the knowledge and the revelation that in the 70s, even the 50s, 60s, that this was a concern, that's new and that definitely matters for negligence and these types of suits. But once it's known that, hey, in the 70s, they've got the testing. You know, they tried to hide certain methods. I know here you say, well, the Reuters talks about concentration, but an October 2017 article basically refers to that same source and says they neglected to use this more accurate test. That's the same level of generality from what I'm seeing. So I'm just to Goldman's point, how if these are all the same correction over and over at the same level of generality, but with just different specifics, I'm just not sure under the case law, does that count as new if it's just the same correction to the same misrepresentation? Thank you, Judge Chung. And I would respectfully disagree with you with your characterization of the earlier misstatements as being somewhat generic, as in Goldman. Let me read you just a few because they are quantifiable. I've got the chart. You don't have to read them to me. All right. Well, when the defendants say into the market our talc products are and always have been free of asbestos, that is a specific misrepresentation. That misrepresentation is 180 degrees away from what J&J internally said in the 2013 markup of the safety and care commitment page, where they said we cannot say always asbestos free. We cannot claim 100 years of safe use. Once that correction is made, if it's the same correction over and over, but based on different sources, I guess why does it count as a new correction? Because it's not necessarily being corrected with the same force with which it was made. Let's not forget that throughout the class period, the defendants are repeatedly and vehemently denying what is being said by persons such as Attorney Mark Lanier at trial. They're going out. Not only are their own attorneys, of course, disputing the evidence during trial. They're hitting MSNBC and Bloomberg in the evening after those trials and giving information to friendly analysts who repeat those denials to the market, saying that our talc remains asbestos free. We've got decades of safe testing. We know they didn't have decades of safe testing. They had decades in which tests showed that there was asbestos in their talc, and they deliberately hid those revelations from, for example, the FDA. But back on Judge Chung's point, so you just described a sequence of information that suggested the talc is contaminated denial, information talc is contaminated denial. Right. Is it your position that for every time there was a denial and then a retort, that retort became, quote, new corrective information? True. Even if it was, as Judge Chung was saying, it was the same data, the same information. I understand that, but let's— Is it the denial that's doing the work, I guess, is my point. It is the denial that's doing the work for them. A well-respected American company, over 100 years in business. Not only that, analysts whose job it is to dig in and dig in to get the truth about a company's finances or its progress. These analysts are repeating to the market, look, what you're hearing in these trials, it's greedy plaintiffs' lawyers versus J&J. J&J has won every one of these trials or gotten guilty verdicts overturned on appeal until the Ingham trial, so that is all corrective— pardon me, that is all information going into the market that is muting, all right, muting the false statements that J&J likes to say is coming out into the market and is acting as a corrective, a pre-Reuters corrective disclosure making Reuters all stale news. That's just not the case. I need you to define new for me because there's a lot of back and forth in the briefs about whether or not this information has to be new. First question, does it have to be new? We don't think it has to be—I'm sorry, we don't think the court has to go there. We actually—that argument to us sounded very much like a loss causation argument, you know, dressed up as price impact. There's nothing in the Goldman Sachs case, for example, which is the latest price impact statement from the Supreme Court that talks about the corrective information having to be brand new. And even if information has to be new, okay, just indulging their point, even if the information, the corrective information has to be new, that is what Reuters did. Was it brand spanking new? Was every piece of it— They repackaged it. They repackaged it. And they made it maybe more accessible to— A little bit more than repackaging, all right? It was a studied gathering of all this data, statements, denials, unpublished studies, things like the Carroll Goodrich redlining of that infamous J&J website where they said we can't always say this. And, I mean, this is an example—here's an example of new and really new, okay? They say that wasn't new because that already had appeared in the Ingham trial. Well, the first page of that markup had been waved around during cross-examination. There were three more pages to that particular document that Reuters linked to. When you go to the second page of that document, you will find other J&J executives saying, you know what, we're going to leave a study out of this webpage because it could actually tell the market that there's a causal connection between our powder and ovarian cancer. And Reuters also linked to the page, including the metadata, which showed that Carroll Goodrich— I think Judge Restrepo's question is more legal, which I'm also interested, which is just what is new, though? You're giving examples of sort of like a spectrum of newness. When does the spectrum end and it's old? You know, what is new? The amethyst case out of the Fifth Circuit, I think, is a good example, and Genius Brands where information that's not— But that's a lost causation at the motion-to-dismiss stage. But the overall context of whether something is truly new in terms of for presentation to the market, for coming into the market, I think that's fairly presented by those cases. I understood you to argue that it doesn't have to be new. And that is our point. All we're saying is if this Court were inclined to agree with the defendants that it has to be, you know, pristine new information that never saw the light of day, either in a trial or even dumped in a document dump on some obscure website, nonetheless, we have also shown that we've already met that. And I'd like to add, I heard earlier, and I can't remember whether it was Judge Schwartz or Judge Chung said to my opponent something about the defendants carrying the burden of proof at the end of the class period. It's not our burden. We've already done what we had to do. We've got the basic presumption, which they concede we've gotten by showing that the material was public and that our clients purchased. The burden then shifted to them. And I believe it may have been Judge Schwartz asked, what's your affirmative evidence? They have none. There's no citation to a page in the appendix where they come forward and say, XYZ shows that we have disproved price impact. In fact, quite the contrary, their own expert, Dr. Clyden, he admits that he did not look at the price impact of the statements that he conceded in the Reuters report were new. But isn't their position that they carried their burden by demonstrating that the evidence adduced to support the ability to rely on the market lacks foundation? No, Judge. That's what they're suggesting, that they don't need to do anything more affirmatively other than kind of deteriorate your evidence. Understood. All they've done, and I apologize for not knowing whether it was Halliburton 1 or Halliburton 2, all they've done is come forward with some casting some, and I'm paraphrasing, casting some aspersions. They've made some showing, but they haven't carried their burden of proving, of severing that link between their misconduct and then the obvious price impact that happens at the end of the class period. So given all of that and given the record here, we think that the district court was well within its broad discretion in holding that they had not proven price impact beyond by preponderance of the evidence, and we ask this court to rule in our favor. Don't go to America's my colleague. I just have one more. I appreciate you wanting to adhere to the time. I did just have one. I think this one is easy. It's just after the motion to dismiss, Judge Wolfson left in two categories of misrepresentations. We've talked mostly about one category today, which is talc is non-carcinogenic, and the talc products don't contain asbestos. There was another category that was corrective actions, R&D, and quality assurance, but it doesn't seem anyone thinks that that's those, even though they survived the motion to dismiss, it doesn't seem anyone is arguing that these corrections correct those misrepresentations. You know, I've written down here, as my opponent was speaking, wrote down the three main areas because there was some talk up here about risk, and this is not a case about risk. This is a case about specific statements about three categories, the safety of J&J powder and talc, the decades of testing, of successful testing that J&J and outside researchers supposedly did, and last but not least, the fact that there is, quote, no asbestos in our products. The R&D and all of that. I think that falls underneath number two, the decades of testing, which we know is a false statement. If you look at your complaint, all of those R&D statements are forward-looking. They're about the new safety initiative. So those forward-looking. And that brings up questions of Sienta and a forward-looking statement and whether or not those statements were protected under the. Well, the question I'm asking is do the corrections, corrections about past historical testing practices correct misrepresentations about J&J's policy moving forward from 2013 on? It wouldn't seem to. Well, we know for a fact that actually J&J had problems with asbestos in its products all the way through the class period. The FDA in 2019 found asbestos. But focusing on the corrective disclosures, is there anything in the corrective disclosures that talk about forward-looking J&J, R&D, or corrective actions from 2013? Not that I'm aware of, Jen. Okay. You talked about in response to Judge Restrepo, the information doesn't need to be new. The corrective disclosure information doesn't need to be new. What evidence can then be used to prove price impact, meaning that the price of the stock when the plaintiff bought it was inflated? If you don't have new corrective disclosures, what other evidence would one be offering as a plaintiff? Well, there's a little bit to unbundle there because this is a price maintenance case. We cast backwards from at the end, and our expert did that, I think, very skillfully. Our expert did an event study, which their expert did not do. Our expert did an event study isolating J&J-specific information to that day of the Reuters report and concluded that that report was the only thing that could have impacted Johnson & Johnson's stock price that day. Defendant's expert didn't even bother to do that. He pointed to two things. Number one, the tired old argument now that each one of the 56 documents was no longer new. They had been aired previously. And the second one was that the tone of a pessimistic Reuters article somehow was what caused the stock, was what drove the price impact that day. And we know that's not true, and I've got 20 reasons. I could stay up here 15 more minutes, but I'll give you just one. After the Reuters report came out the next month, January 2019, inside J&J, an executive committee memo to the executive committee said, quote, the Reuters report, quote, led to a 10% stock decline and $40 billion market cap loss, and that's in the record at page 4307. That admission didn't say, you know what, it was kind of a nasty, pessimistic article. That doesn't mean it's price impact. That can just be price reaction. Well, as I said before. That also isn't really responsive to the question I was asking, so sorry. Because if I understood the beginning before you started talking about January 2019, what you are saying is one way that one could prove price impact is to say if there's evidence out there, there's company-specific information in the market, and there is a drop chronologically after that disclosure, that would be sufficient to draw an inference that at some point earlier the price at the time of purchase was inflated. So is your focus company-specific information, not newness? And I hate— And am I wrong? Tell me. I'm just trying to— No, I really regret to sound obstinate here, Your Honor, but it is not our burden. It is their burden. They are the ones that have to disprove that price impact. I understand whose burden proof it is, but we're trying to get educated on what the law is or what you think it should be. And if the position is it's got to be—a corrective disclosure is a way to prove it, could—and I'm pivoting off of an answer you gave to Judge Chung—company-specific information, new or not, if there is something that happens thereafter, it could be used as a basis to make an inference forward. Am I understanding you correctly? Yes, you are. And our expert went well beyond what we needed to show. Our expert did some of the work that their expert did not do, as a matter of fact, so. Judge Restrepo, any other—Judge Chung? Okay, thank you, Counsel. Thank you, Your Honors. All right, we'll hear from Counsel on rebuttal. Thank you, Your Honors. Let me pick up right where you left off with this event study issue. The event study doesn't address price impact at all. What an event study does is it explains why the drop in a particular company's stock price is not due to forces that are, you know, industry-wide or generally market-wide. Like, if you lost money yesterday, an event study isn't going to tell you whether that was corrective, right? You need something else because, you know, stocks dropped for lots of reasons. And the position that I understood my friend to take just now is a direct rejection of the price reaction versus price impact distinction that's at the heart of this case. They don't think they need—they think they can say, they can point to an event study, can point to a big drop, label something corrective, and they're done. And that's exactly what the new and corrective position we've taken is resisting. And I also want to return to something that we didn't discuss, which was the district court's errors in this case. The district court did not say that there was any new fact. In fact, at 101, and again at 102, it said, I don't even have to decide at the class certification stage whether a corrective disclosure is corrective. At 96, it said, it doesn't matter if the information's not new. That's fine. Those are legal errors, and automatically and without any basis, in fact, that those legal errors are the basis of the class certification in this case. So if you agree with us that the information in a corrective disclosure, if we demonstrate that in a price—in this kind of price maintenance case, that the corrective disclosure is not new, facts, Judge Chung, facts, and I really want to emphasize this, it's not enough if it's just, you know, some other stuff. And I'll get to the—in a minute, get to the handful, three things they pointed to today that they say are new. But if it's not new and it's not corrective, then the corrective disclosure cannot—the alleged corrective disclosure cannot carry price impact. As a matter of law, we have the burden to demonstrate the absence of newness and the absence of correctiveness. We've done that here, and the district court didn't find it. You said, as a matter of law, it's also a case you're relying on. Exactly what case says it has to be new and corrective? Oh, the combination of cases I think are Omnicom and Meyer are very clear on new. And I think corrective is very—it comes right out of Goldman. And there's no way—there's no way to read that out of Goldman. Now, you know, let's talk about the new—the district court didn't identify any new facts. The briefing before the district court by the plaintiff didn't identify any new facts. The briefing on appeal didn't identify any new facts. Today we heard Langer repeating, standing by, his prior information. He didn't say he did a new study. That's not a new fact. That's just another new opinion standing by his previous fact. That doesn't change the mix of information that goes into the marketplace through the efficient market hypothesis. They say the—they say this test about the concentration, you look at 4882 of the record, you'll see exactly where we demonstrate that that had been previously disclosed months before the Reuters report during the Ingham trial. And then they referred to another previous report that had been truncated. That was discussed openly in Hereford and in Ingham, again, months before the Reuters report. They have no facts. They have no new facts. They—certainly our experts said there are new facts, but whatever's new about them simply isn't corrective. And you need both. And you need both. The repeated denials cannot do the work that they claim they need to do. That would effectively destroy—first of all, our repeated denials are well-founded, given our consistent efforts to prevail in these litigations. But again, that's not new facts. We've been repeatedly denying through the mix of information for decades. That doesn't change the mix of information to the marketplace. The factual basis of that information, that's our opinion of the facts. And we're standing by that, of course. But opinions don't count. Judge Schwartz, you asked at the beginning about stopping with—if you just decide Reuters had new and corrective. Obviously, we disagree with the premise, but— I understand that. I just want to know, like, as— The answer is you can't stop. You can't stop. You have to do the others. Just give me the reason why we have to do all the others. Because the claim—because the way the class is certified, only people who hold through the corrective disclosure can be part of the class. And right now, you've got six—you've got essentially six different class claims based on six different disclosures. It's because of the way the class is defined. Correct. That's really the question I asked. And basically LabCorp is going to say—well, we anticipate, potentially, LabCorp is going to say if you have uninjured class members in your class, your class isn't valid. But there you've answered my question. It has to do with how the class is defined. The last thing I'll say, and Judge Chung, I think you've already anticipated this, is a medicist and genius brands are fundamentally different. Right? In a medicist, what you have is an allegation, just an allegation on the complaint, that those cases, the facts that are out there were disparate, raw data that had to be collected up, and it would take more than just zero marginal cost to get the new information that came out of that analysis. Right? By the way, same thing happened in this case. They asserted that—they made the claim in response to our motion to dismiss. We have our—the reporter saying this is new information. We were stuck with that at the class certification stage, I mean, in fact, at the motion to dismiss stage, and so we lost the case. But we got to discovery, and we got—we took the burden of proof, and we proved exactly what the people in a medicist and genius brands didn't have a chance to prove yet because they got dismissed on a motion to dismiss. We proved that it was all not new or not corrective, all of the information, and that the cost of acquiring that information in this kind of efficient market was undeniably, you know, zero or near zero, given their own theory of the case. Let me just see if my colleagues have any further questions. I don't. Okay. All right. Catch your breath. Have a seat. We thank counsel for both sides for the very helpful briefing and arguments today. We're going to ask that a transcript of the argument be prepared for the court, please, and if the sides could split the cost of that transcript, we'd appreciate it. And the court will take the matter under advisement.